**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00629 (EGS)** |
| **v.** | : | |
| | : | |
| **JASON MICHAEL COMEAU,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jason Michael Comeau ("Comeau") to 20 days' jail, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

The defendant, Jason Comeau, a 40-year-old co-owner of a Florida landscaping company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than one million dollars' of property damage.

Comeau pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 20 days' incarceration is appropriate in this case because Comeau: (1) contemplated scaling a wall to get inside the Capitol, a possibility that should have made his lack of permission to enter clear; (2) joined a mob chanting outside the entrance to the House Chamber, threatening Congress and

1

indicating intent to disrupt the certification vote; and (3) while cooperative in some respects, minimized certain aspects of his conduct at other times, indicating some need for specific deterrence and punishment to promote the rule of law.

Comeau saw his efforts that day as "taking the Capitol."  He entered the Capitol and remained inside for at least 25 minutes, joining the mob chanting outside locked doors to the House Chamber. After the shooting of Ashli Babbit, police began clearing the area, and Comeau left the building. When the FBI approached him in January, 2021, Comeau admitted he had entered the building although, even at his change of plea hearing, he continued to claim that the police had allowed him inside (although he ultimately acknowledged and agreed with the Statement of Offense, where he admits he lacked permission).

The Court must also consider that Comeau's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. Here, Comeau's participation in a riot that actually succeeded in halting the Congressional certification combined with  his participation in a mob that terrorized members of Congress and his continued minimization and justification of his conduct renders a period of incarceration necessary.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

As background, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 21 (Statement of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Comeau's conduct and behavior on January 6.

*Jason Comeau's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Jason Comeau traveled with his father to Washington, D.C., from his home in Florida to attend the "Stop the Steal" rally in support of former President Trump. Comeau attended the rally on January 6. At its end, Comeau saw thousands of people begin walking toward the Capitol Building. He and his father joined them, and filmed cell phone videos along the way, some of which he later posted to Facebook. In one video, Comeau commented, "did you see that they breached the Capitol building?" He later said, "Patriotism is the opposite of liberalism."

Once he arrived at the Capitol, Comeau entered the restricted area. At approximately 2:13 p.m., approaching the building, he filmed a video, narrating, "we're taking the Capitol, guys." He joined in chants of "stop the steal!" and walked forward, past metal barriers. Explosions were audible. Comeau walked toward rioters climbing a wall, at the top of which were stairs leading toward entrances to the Capitol Building, and said, "I might have to Spider-man it," and "I'm gonna climb that." He said to his father, "I don't know if you can make this."

Leaving his father behind, by 2:28 p.m., Comeau had entered the Capitol Building. He passed through the Crypt (where he filmed another video, during which he commented, "we made it inside!") and Statuary Hall before arriving at the Statuary Hall Connector, which leads to the House of Representatives chamber. Comeau joined a large mob gathered outside the locked door to the chamber and joined in chants of "stop the steal!" Ex. A (video clip) at 0:40 (Comeau visible at 0:55-0:58). Various members of the crowd yelled at the front of the mob that they should break down the door and knock the windows out using their ballistic gear – helmets and "kevlar." *Id.* at

0:29, 1:00, 2:00.  Another shouted that he had a knife.  *Id.* at 1:10. Others called on the mob to "push!".  *Id.* at 1:30-1:39. The mob also chanted "break it down!"  *Id.* at 3:12-3:26.



*Figure 1*

Having not succeeded in breaching the front entrance to the House Chamber, members of the mob broke off and moved down a hallway toward the Speaker's Lobby, another potential path to the House Chamber.  There, Ashli Babbit was shot.  Soon after the shooting, Metropolitan Police Department officers began directing rioters gathered in the hallways near the House Chamber toward an exit from the Capitol Building.  Below is a screenshot from one officer's body-worn camera showing Comeau in the hallway just before officers began to clear the area.



*Figure 2*

At approximately 2:55 p.m., Comeau walked out of the Capitol Building. As the PSR describes, Comeau later called his brother, an FBI agent, and admitted to entering the Capitol. PSR ¶ 22.

*Jason Comeau's Interview*

On January 18, 2021, Comeau agreed to speak to an FBI Task Force Officer (TFO) who came to his residence. Comeau explained that he traveled from Florida to Washington to attend former President Trump's rally. After spending a day sightseeing in the city (it was his first visit there), he attended the rally on January 6, starting at around 8:00 a.m. Toward the end of the rally, Comeau joined a large group (several thousand people, Comeau estimated), who walked to the U.S. Capitol. Once the group arrived, Comeau said he squeezed past others to access a staircase and get a better view of the size of the crowd. Comeau described standing on the steps

and seeing U.S. Capitol Police standing in front of an open door to the Capitol. After several minutes of the crowds chanting "let us in!", the police moved to the side, and rioters entered the Capitol. Comeau told the FBI that he thought he was allowed inside because he had seen police officers step aside and others enter before him. He said he had entered the Capitol only because he thought officers had allowed the rioters to enter.

Comeau described the inside of the Capitol as packed; he said that he could barely move. He said that, after a few minutes inside, he observed officers asking people to leave and moving the crowd back outside. He falsely told the TFO that he had only been in a "hallway" before being asked to leave. He said that, once he observed individuals climbing walls and yelling, he left the area so that he would not be hurt or involved in any illegal activities. The TFO characterized Comeau as "very apologetic and cooperative," but the FBI had not yet gathered and analyzed all the evidence indicating that Comeau had actually spent at least 25 minutes inside the Capitol, joined in chanting, moved through multiple floors of the building, and contemplated climbing a wall to gain entry to the building.

*The Charges and Plea Agreement*

On October 13, 2021, Jason Comeau was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 14, 2021, Comeau was arrested at his home in Florida. On October 15, Comeau was charged by four-count information with violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 21, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), violent entry and disorderly conduct - parading, demonstrating, or picketing in any of the Capitol Buildings. By plea agreement, Comeau agreed to pay $500 in restitution to the Department of the Treasury. At the plea hearing,

Comeau again suggested that he had permission to enter the building, before ultimately agreeing, consistent with the Statement of Offense he signed, that he did not.

### III.    Statutory Penalties

Comeau now faces a sentencing for a single violation of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Comeau faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a short term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Comeau's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Comeau personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Comeau's part is therefore not a mitigating factor in this misdemeanor case, nor does it meaningfully distinguish Comeau from most other misdemeanor defendants.

Some of the factors here support a more lenient sentence. The government is not aware of statements on social media advocating or encouraging violence. Comeau promptly pleaded guilty. He almost immediately admitted to the FBI that he had entered the Capitol.

Comeau's conduct is not without aggravating factors, though. Despite his after-the-fact claims that he was allowed inside the Capitol Building, evidence from January 6 indicates that Comeau participated in the riot with full awareness that he was, in his words, "taking the Capitol." Had the rioters been authorized to enter the building, there would have been nothing to "take." Other evidence in this case refutes any claim that this was simply a poor choice of words on Comeau's part. After commenting, "we're taking the Capitol," Comeau approached the building and saw people climbing the walls to access it. He talked about joining them. No one who thought he would have to climb a wall to get inside the Capitol can plausibly assert that his presence there was welcome on January 6.

Once inside the building, Comeau did not, as he claimed, remain in a hallway and leave at officers' request after a few minutes. He was inside the building for at least 25 minutes. He traveled through at least two floors of the building, moving from the Crypt upstairs to Statuary Hall and through the Statuary Hall to a door to the House Chamber. At that door, members of the mob drew together, banged on the door, and chanted "stop the steal!"  Comeau joined in. In so doing, he communicated why he had considered scaling a wall,[1] why he had left his father behind to join in the "taking" of Capitol: to change the results of a democratic election. Of course, the simple act of protesting what one perceives to be an unfair election is not a crime. But that is not what Comeau did. He breached the Capitol and stood right outside the very room where the lawmakers were

---

[1] The government is not aware of video depicting Comeau's entrance to the Capitol and has not been able to determine whether he actually scaled a wall to access the building.

supposed to be certifying the election results. Comeau and the rioters he stood alongside formed a terrifying mob that banged on the door, yelled to make its presence and numbers known, and sought to break into the House Chamber.  Comeau did not shrink from this group; he proudly joined their cries.

As he stood outside the House Chamber between approximately 2:35 and 2:40 p.m., chanting with the mob, lawmakers began evacuating the Chamber. Those in the gallery sheltered in place.  The following two photos show the interior of the House Chamber during the riot; the first depicts the Gallery.[2]



*Figure 3*[3]

[2] According to a U.S. Capitol timeline of events, Capitol Police began evacuating members of Congress inside the House Chamber at 2:39 p.m.; at 2:44, officers, members, and staff on the third-floor gallery barricaded themselves in and sheltered in place.
[3] Andrew Harnik, Associated Press, *available at https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection* (last visited March 2, 2022).



*Figure 4*[4]

These photographs underscore the seriousness of Comeau's offense. Even if he did not personally commit or specifically encourage violence or property damage, he should have known what it meant to join a mob that literally banged on Congress's door, swelling in numbers, threatening to break in. He did not run from that mob; he chanted along with it.

A year after the Capitol attack, some Members of Congress who had been trapped in the House Gallery shared their recollections.[5] "When I looked up, I had this realization that we were

---

[4] J. Scott Applewhite, Associated Press, *available at https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection.*

[5] Mary Clare Jalonick, Associated Press. "'We were trapped': Trauma of Jan. 6 lingers for lawmakers," *available at https://apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e29724aa6017180259385642c1b990.*

trapped," said Representative Jason Crow of Colorado, a former Army Ranger. [6] "I think all of us, myself included, had images of a mass-shooting event," remembered Representative Peter Welch. "It was terrifying in the moment." [7]   Representative Val Demings told a colleague, "Just remember, we're on the right side of history. If we all die today, another group will come in and certify those ballots."[8]   Some members were later diagnosed with post-traumatic stress disorder.[9]   As the Associated Press further describes the scene:

> For those still in the gallery, fear was escalating. Crow was tending to Rep. Susan Wild, D-Pa., who was in distress after talking to a family member, while also communicating with [Representative Markwayne] Mullin on the floor below as he helped barricade the door. Rep. Lisa Blunt Rochester, D-Del., was shouting a prayer for peace and healing. [Representative Pramila] Jayapal, who had knee replacement surgery just a few weeks earlier and was using a cane, was trying to figure out how she would escape if she had to run. She held hands with some of her female colleagues crouching beside her.[10]

The actions of Comeau, alongside others, are why members of Congress had to lay down on the floor of the gallery and put on gas masks, not knowing who was on the other side of the door to the Chamber and how far they would try go to influence the outcome of the election.

Comeau has minimized his actions on January 6. It initially seemed that Comeau was cooperative. According to the PSR, he called his brother, an FBI agent, and immediately admitted what he had done. When the FBI interviewed him less than two weeks later, on January 18, he again admitted he had entered the Capitol, and the interviewing TFO opined that he was "very apologetic and cooperative."

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*

That agent, however, did not have access to all the evidence in the case, which ultimately revealed that Comeau lied to the TFO in important respects. He made the excuse that he thought he was allowed inside.  Even if Comeau were correct that police officers moved to the side, no reasonable person would believe he was allowed to enter the Capitol that day.  Comeau himself commented that rioters were "taking" the Capitol  and discussed climbing a wall to participate in the breach.  Moreover, he already would have had to trespass on Capitol Grounds to even make it to the door to the Capitol Building. In his initial interview, Comeau also falsely stated he stayed in a hallway and remained inside for only a few minutes before leaving at officers' request; in fact, he moved through several rooms across two floors and stayed inside for at least 25 minutes. He told the TFO he left the area once he observed individuals climbing walls; in fact, he saw them as he approached the Capitol, admired them, and talked about following suit.  Aside from the fact of his guilty plea and acceptance of the Statement of Offense, Comeau has yet to express contrition for the full scope of his conduct.

On balance, the nature and the circumstances of this offense establish the need for a short term of incarceration in this matter.

### B.  Comeau's History and Characteristics

As reported in the PSR, Comeau has six prior convictions, all sustained between 2002 and 2009, as well as six traffic infractions. PSR ¶¶ 26-33. Two convictions arise from defendant's drug use in the military, which resulted in a "general" discharge from the U.S. Army in 2002 (he had enlisted in 2000). PSR ¶¶ 26-27. The remaining four are motor vehicle offenses (DUIs, careless driving (two), and driving with a suspended licenses). PSR ¶¶ 28-31. Three of those convictions occurred after Comeau crashed a car. PSR ¶¶ 29-31. On two occasions, Comeau left the scene of the accident. PSR ¶¶ 29-30. Following his 2009 conviction for driving

while intoxicated, Comeau violated his probation, and was sentenced to five days' jail. Otherwise, none of Comeau's convictions resulted in prison sentences. The government recognizes that these convictions are all over ten years old, although Comeau was arrested twice in 2019. While Comeau's criminal history does not demand a term of incarceration, it is not so blemish-free as to support a purely probationary sentence either.

Comeau owns a landscaping business with his father, who traveled to the Capitol with him (but did not, to the government's knowledge, enter the building). PSR ¶ 62. His social media presence is limited. *Id.* ¶ 52. He has been compliant while on pretrial release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Comeau's resistance to acknowledging the full scope of his conduct demonstrates some need for specific deterrence. If he persists in believing that he and other rioters were allowed to enter the Capitol, it would increase the risk that he would offend again. That said, the government is not aware of other evidence that Comeau poses an ongoing risk, such as social media messages celebrating the riot.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[12] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[13]  *See United States v. Anna Morgan-Lloyd*,

---

[12]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[13]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas*

1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts continue to make distinctions between the January 6 offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Comeau has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether

---

*K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on two other defendants who, like Comeau, made their way to the hall just outside the House Chamber for reference. Virginia Spencer was sentenced to three months' jail time. *United States v. Virginia Spencer,* No. 21-cr-147 (CKK). Virginia Spencer saw people climbing the scaffolding as she approached the Capitol Building, just as Comeau observed rioters climbing a wall. Gov. Sent.

18

Mem, *Spencer*, No. 21-cr-147, ECF No. 55, at 5. She progressed from the Crypt to Statuary Hall (stopping by Speaker Pelosi's office suite) to the doors of the House Chamber and joined the same mob as Comeau, although she was "not vocal." *Id.* at 10.  In her initial interview with the FBI, Spencer also minimized her conduct, claiming she could not turn around because she was being pushed into the building, a claim that video evidence contradicted. *Id.* at 11-12. She had one misdemeanor conviction, for driving with a revoked license – Comeau has several more. *Id.* at 19. She did, however, bring a 14-year-old child with her into the Capitol, an aggravating factor not present here.

The Court is also familiar with the case of *United States v. James Bonet*, 21-cr-121 (EGS), recently sentenced to 90 days' incarceration on a violation of 18 U.S.C. § 1752(a)(1). Comeau made it farther into the Capitol than Bonet, who did not go past the Crypt, and Comeau spent at least ten minutes longer inside. Comeau and Bonet both ignored red flags that should have led them to turn back. Both made statements that minimized their conduct. Both also have some criminal history. On balance, though, Bonet's case involves a significant aggravating factor not present here: he posted a video of himself on social media, showing him smoking a joint in a Senator's office. Bonet's minimization was also arguably more significant than Comeau's: he gave a television interview in connection with the anniversary of January 6 where he characterized his conduct as a peaceful protest, directly contradicting assertions that he had learned from his actions. While Comeau filmed videos of the riot too, the government is not aware that he broadcast them; he did not enter a private office, and, to the government's knowledge, his disorderly conduct once inside the building was limited to chanting.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.  The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence). Comeau's numerous arrests and convictions indicate a need for a period of supervision here, in addition to some incarceration.

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989)

(noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[14] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[15]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[14] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[15] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later, Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of

23

a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with

icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In

other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Comeau pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[16]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

---

[16] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[17]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in Comeau's case given the requested 20-day imprisonment sentence.

---

[17] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jason Comeau to 20 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Comeau's liberty as a consequence of his behavior, while crediting his prompt guilty plea and his relative role in the Capitol riot.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      _/s/ Alexis J. Loeb_
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney
Detailee
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
Office: 415-436-7168
Alexis.Loeb@usdoj.gov